**VALLEY GAS COMPANY, Petitioners,**

v.

**FEDERAL POWER COMMISSION,**
**Respondents,**
**Tennessee Gas Pipeline Company et al.,**
**Intervenors.**

No. 71-1743.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 10, 1972.

Decided Oct. 2, 1973.

---

Morton L. Simons, Washington, D. C., with whom Barbara M. Simons, Washington, D. C., was on the brief, for petitioners. Harold L. Talisman, Washington, D. C., also entered an appearance for petitioners.

Michael J. Manning, Atty., F.P.C., with whom Gordon Gooch, Gen. Counsel, Leo E. Forquer, Sol., J. Richard Tiano, First Asst. Sol. at the time the brief was filed, and George P. Lewnes, Asst. Gen. Counsel, F.P.C., were on the brief, for respondent.

Harold L. Talisman, Washington, D. C., with whom Harry S. Welch, Houston, Tex., and Harry S. Littman, Washington, D. C., were on the brief, for intervenor Tennessee Gas Pipeline Co.

Francis H. Caskin, Washington, D. C., was on the brief for intervenors New England Gas and Electric Assn. and Air Products and Chemicals, Inc.

John W. Glendening, Jr., New York City, was on the brief for intervenor the Berkshire Gas Co., et al.

Before LEVENTHAL and WILKEY, Circuit Judges, and RONALD N. DAVIES,* Senior Judge, United States District Court for the District of North Dakota.

WILKEY, Circuit Judge:

This case arises on petition for review of an order of the Federal Power Commission [1] which permitted the Ten-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. Tennessee's application for abandonment authority was filed in Docket No. CP70–311 on 19 June 1970. The Presiding Examiner's initial decision granting that authority was issued on 20 April 1971. Appendix, Vol. I, pp. 35–57; Record at 1306–28. The Commission affirmed and adopted the Examiner's decision by an Order, the specific subject of review here, issued 21 July 1971. App., Vol.

nessee Gas Pipeline Company, a division of Tenneco Inc. (Tennessee), to abandon certain liquified natural gas (LNG) facilities [2] for the purpose of selling them to the New England Gas and Electric Association and Air Products & Chemicals, Inc. (NEGEA). As the basis for allowing such abandonment, in accordance with Section 7(b) of the Natural Gas Act,[3] the Commission found that "the public interest will be best served by granting Tennessee's application."[4] Finding that conclusion to be supported by substantial evidence, and to have been based on legally appropriate criteria, we affirm the Commission's Order.

## I. Facts

On 26 July 1965 the Commission issued a certificate of public convenience and necessity authorizing construction and operation of an in-ground storage LNG facility near Hopkinton, Massachusetts.[5] This facility had been requested by Tennessee's customers with a view that it would help to provide "peak-shaving"[6] natural gas service during the winter months, by means of evaporating gas which had been liquified during the off-peak season and stored underground. Not only would such a large centralized facility spare Tennessee's various customers the expense and inconvenience of building their own LNG peaking facilities, it would also, it was hoped, result in a lower overall cost of gas.[7]

The liquefaction of natural gas for storage in the in-ground tanks was commenced early in 1967, in anticipation that redelivery of the gas in the form of peaking service to customers who had contracted for such service could start in the fall of 1967. Unfortunately, despite continuous attempts to fill the storage tanks, an unexpectedly high "boil off" rate held the effective storage level to one-sixth of the planned capacity.[8]

I, pp. 111–12; Record at 1458–59. Rehearing was denied by an Order issued 15 September 1971 and amended 30 September 1971. App., Vol. I, pp. 116–17, 121; Record at 1463–64, 1468.

2. Docket No. CP70–311 concerned the abandonment of the LNG facility and the proposed peaking service to be supplied thereby. In a consolidated Docket No. CP65–352, Tennessee asked and was granted the Commission's approval of its withdrawal of a petition to amend its previous certificate to authorize a plan to substitute above-ground storage tanks for in-ground storage reservoirs in connection with the LNG facilities. Another consolidated Docket No. CP71–20 concerned abandonment of a related five mile long delivery line.

3. 15 U.S.C. § 717f(b).

4. App., Vol. I, p. 57 (Presiding Examiner's decision, adopted by the Commission). The relevant statute provides:
   (b) No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present · or future

public convenience or necessity permit such abandonment.

5. At the time this project was planned, it was thought that in-ground storage reservoirs would have the advantages of both increased economy and greater safety.

6. "Peak-shaving" refers to the use of a supplemental supply of gas to augment normal pipeline supplies during peak demand periods of relatively short duration.

7. The use of "peak-shaving" helps to reduce the price of gas to customers. The rate for pipeline general service normally consists of two parts: (1) a commodity charge for each Mcf actually purchased and (2) a demand charge which, in the case of Tennessee's General Service, is a monthly charge based on the greatest volume of gas delivered to the customer under that type of service on any day during the preceding twelve months. Since peak-shaving levels out the short-termed highest periods of demand for General Service, taking gas for this peak demand from such a separate source reduces the demand charge throughout the succeeding twelve months.

8. The liquefaction of gas at Tennessee's compressor station at Hopkinton, Massachusetts began early in 1967. Although the facilities were continuously operated at near capacity for some time, it became apparent that the "boil-off" rate so far exceeded ex-

Commencement of peaking service was impossible in the face of that technological problem; extensive efforts to find a solution were unsuccessful.

Faced with this failure, Tennessee proposed an additional investment in above-ground tanks of equal capacity and filed an application to amend its certificate to that effect. However, since such a change would add dramatically to the cost of service, Tennessee conditioned its proposal on the willingness of its customers to purchase volumes of natural gas from the above-ground project at higher rates, sufficient to render it economically feasible. The customers were willing to purchase only one-sixth of the necessary volume.[9] Therefore, Tennessee entered into a contract to sell its facilities to NEGEA,[10] and applied for authority to abandon the original project in order to be in position to sell the facilities.

The only one of Tennessee's customers to oppose abandonment was Valley Gas Company (Valley). Unlike many of the prior customers, Valley was not one of those prior contractors for LNG service who would be receiving peaking service, at least in some amount, from NEGEA.[11] Valley claimed that, as a condition of approval of the abandonment, Tennessee should be ordered to provide it with some sort of substitute service essentially equivalent to that which it would have received had Tennessee's project been a success.

On 20 April 1971 the Presiding Examiner ruled that the abandonment application should be unconditionally granted. He deferred disposition of Valley's request for substitute service until the second phase of the administrative proceedings, which would also deal with the proper accounting treatment to be given to Tennessee's unrecovered costs. By order of 21 July 1971 the Commission affirmed and adopted the Examiner's decision. The Commission approved the delay of decision on Valley's claim, noting that the Phase II hearings were by then already completed and that "fairness to New England LNG users compels our prompt decision in Phase I."[12]

## II. *Abandonment Authorization*

We find that the Commission's order permitting abandonment was supported by substantial evidence and premised on proper criteria. The standard to be applied by the FPC in such cases is hardly a model of clarity and detail. The Natural Gas Act provides that abandonment shall be allowed only if permitted by "the present or future public convenience or necessity."[13] However, the key elements in the decision must obviously be the provision of the maximum supply of gas, at the lowest possible rate, consistent with the physical and economic realities of the industry. The Commission clearly applied the appropriate test in this case.

pectations that the 3,000,000 Mcf capacity in-ground reservoirs could only be filled to a storage level of 500,000 Mcf. App., Vol. I, p. 39.

9. The original average rate offered by Tennessee for LNG service was $1.25 per Mcf. After the need for installing above-ground storage tanks was discovered Tennessee determined that it would not be able to operate the project without an average LNG service rate of $1.99 per Mcf. Because most of the potential customers felt that other arrangements would be preferable to this new proposal, Tennessee found that it could sell only 500,000 Mcf annually on that basis, whereas the feasibility of going forward depended on annual LNG sales of six

times that amount. App., Vol. I, p. 46; Record at 65, 1317.

10. On 1 April 1970 Tennessee contracted to sell the LNG facility to NEGEA for a total price of over $4 million.

11. A group of 22 New England customers of Tennessee intervened below to urge that abandonment authorization be granted as expeditiously as possible. App., Vol. I, p. 40; Record at 23–24. This group includes 16 of the 18 distribution companies to which Tennessee proposed to supply LNG service from its in-ground project. The other two would-be LNG customers were Worcester (a subsidiary of NEGEA) and Valley.

12. App., Vol. I, p. 111; Record at 1458.

13. 15 U.S.C. § 717f(b).

There is no question that Tennessee's project, as originally certificated, had foundered on insurmountable physical defects encountered in the structure of the in-ground reservoirs. If the Commission had disallowed abandonment, it would in effect have been deciding to require Tennessee to press its application for amendment of the certificate, despite the fact that Tennessee's new above-ground storage proposal lacked customer support. Given the lack of support, the Commission could not ignore the fact that Tennessee's proposal would have involved greater cost and delay than the readily available alternative represented by an approved sale of the facilities to NEGEA.[14]

■ Since the applicable statutory standard is the present or future public interest, the Commission quite properly refrained from recriminations and concentration on hindsight in reaching its decision.[15] The question before the Commission was not what might have or should have been done to make the in-ground LNG storage project a success, but rather what course was now best for all the customers of gas in the New England region. In that light, the advantages of the NEGEA proposal were just as important as the disadvantages of Tennessee's new plan.

With regard to those customers who would be receiving LNG service from NEGEA (largely Worcester and New Bedford—but many others as well for a while), there was an advantage in cost.[16] By buying Tennessee's liquefaction facilities, and building its own storage tanks, the NEGEA group was eliminating the middleman as to those functions.

14. While Valley has cast aspersions on Tennessee's cost calculations, it basically focuses its appeal on the claim that it is entitled in equity to more favorable treatment following the abandonment than Tennessee proposes. We would have a more sophisticated question to review if Valley or other of Tennessee's customers had focused on a contention that the low market support for Tennessee's proposal was only a corollary of Tennessee's use of higher cost calculations than were used by NEGEA; that this in turn was faulty, because it reflected Tennessee's insistence on its $15 million original cost, whereas NEGEA's calculations reflected that it was able to pick up Tennessee's facility at a $4 million price, in a very limited market for specialty equipment; that this in turn reflected the fact that the equipment was not worth more than $4 million to NEGEA. Thus if Tennessee had in good faith accepted the reality that its $15 million investment was now worth only $4 million, and charged the $11 million difference to obsolescence or an extraordinary loss, it, too, would have had a low capital cost, which would have calculated out to realistic rates that would have generated a market. All this was bypassed because Tennessee did not want to jeopardize its claim that it should be allowed to amortize this loss through charges over a period of years (which would have been translated into cost of service in a rate case calculation), a claim that was rejected in Phase II.

We make these observations because we do not wish to be taken as being completely unaware of the possibility of what may well have been industry realities. But as a court our function is to pass on contentions presented to the Commission and to us, and we are not free to roam into matters that the FPC might have taken up *sua sponte*.

15. The Commission properly found it "necessary to evaluate the public interest under today's circumstances, as distinguished from the 1965 gas supply situation." App., Vol. I, pp. 43–44; Record at 1314–15.

16. Valley claimed that support for Tennessee's quote of $1.99 per Mcf for its above-granted proposal was "dubious". However, the Commission reviewed Tennessee's cost study and correctly found that Valley "failed to present evidence contradicting the results of that study." App., Vol. I, p. 47; Record at 1318. There is nothing in the record to suggest bad faith on Tennessee's part. Nor should we have expected to find any, since operation of the facility at rates acceptable to its customers would most likely have entitled Tennessee to include all of its unrecovered costs in its rate base, while failure to go forward launched them into the complex, and for them unfortunately resolved, accounting problems discussed in our review of Phase II.

Valley's companion suggestion that Tennessee could have proceeded with the $1.25 rate and, immediately upon commencement of service filed for a rate increase merely demonstrates that forcing Tennessee to continue with the above-ground project would have resulted in either lack of adequate market support or the entrapment of customers tied in to a higher rate against their will.

It is true that those customers, most importantly Valley, who would not receive any LNG service from the Hopkinton plant, if abandonment were approved, found this reduction in cost to their neighbors cold comfort. However, the alternatives available at the crucial time were not higher cost gas to all as opposed to lower cost gas to a few. To the contrary, Tennessee's LNG plant remained in its moribund state,[17] unable to commence operation in the near future —whereas NEGEA's purchase of the plant promised to allow much more rapid utilization of these facilities than would have been possible even under Tennessee's proposed amendment authorizing above-ground storage operations, to the greater good of all New England gas customers.

The advantages of more rapid commencement of service from NEGEA stemmed from legitimate and very real considerations. Tennessee would have had to commence construction of above-ground tanks from scratch once its application for amendment was granted, a process requiring approximately 19 months.[18] In contrast, NEGEA already had adequate above-ground tanks in construction near the site.[19] Although Tennessee had obtained authority from the Massachusetts Department of Public Utilities in 1965 for its in-ground LNG reservoirs, it had not received similar authority for its above-ground proposal. Nor, in the alternative, had it obtained a variance from the Zoning Board of Appeals of the Town of Hopkinton, as required by Massachusetts law.[20] In contrast, NEGEA's above-ground storage tanks had received all necessary approvals.[21]

In addition to the cost and timing advantages of NEGEA's proposed project, the Commission also properly considered the lack of a market adequate to support Tennessee's proposal at the increased rates required by the additional investment in above-ground tanks. We accept Valley's contention that in an abandonment proceeding the applicant (Tennessee) bears the burden of showing absence of market support, just as an application for amendment of a certificate of public convenience and necessity normally requires an affirmative showing of the degree of market support which exists for the change.[22] No matter where the burden rested, the record amply supports only one possible conclusion—Tennessee could not obtain adequate customer commitment at the increased rates. On being apprised of the cost of the new proposal, the vast majority of the prospective customers decided to make alternative arrangements for peaking service, at least for most of their required supply. In light of that situation, compelling Tennessee to proceed with its application for amendment of the certificate would have been an illegal exercise in futility.

To support its claim that the Commission's order was founded on legally im-

---

17. Tennessee shut down the liquefaction process in May of 1969 and thereafter ceased all significant activity at the Hopkinton plant site.

18. Record at 967.

19. NEGEA's first above-ground storage tank at Hopkinton was planned to be completed by August 1971. Two tanks were in fact in operation by early November 1971. Record at 94.

20. Mass. General Laws, Chapter 40A, Sections 15–17.

21. Among the intriguing questions unanswered in this record, but irrelevant to our disposition herein, is why NEGEA was building above-ground tanks so conveniently near the Hopkinton liquefaction plant. Without these NEGEA would not have been in position largely to assume the Tennessee project.

22. We accept Valley's characterization of the burden in order to give the benefit of the doubt to their argument that Tennessee could have proceeded with construction of the above-ground tanks under its previous certificate. If that were the case the issue would be properly framed as solely an abandonment application. However, we note that this alleged existing authority to go ahead would not have relieved Tennessee of its more central need to meet the added expense involved.

permissible criteria, Valley cites Michigan Consolidated Gas Company v. FPC.[23] In that case, the court found that abandonment of gas service could not be legally justified merely because the pipeline, Panhandle, "prefer[red] to use that gas for more profitable unregulated sales, or because it want[ed] to be rid of what it consider[ed] a vexatious servitude." [24] However, *Michigan Consolidated* involved a supply of gas which had already been committed, on a long term basis, to an established service. Further, there were "strong indications that one of Panhandle's primary purposes in seeking abandonment [was] to shift gas from regulated to unregulated sales." [25] Michigan Consolidated, the only affected customer, vigorously opposed the abandonment and pointed out that uncommitted gas was available to meet the pipeline's contractual obligation. In contrast, Tennessee seeks abandonment of a service which was not even begun, the difficulties with which obviously stem from technological problems rather than a desire to avoid regulation, in the context of bona fide gas shortage requiring general refusals of new service commitments,[26] and with the support of all but one of its prospective customers.

### III. *Deferral of Valley's Claim*

■ As previously mentioned, the Commission ordered the proceeding split into two parts.[27] Valley further ascribes as error the Commission's approval of the Examiner's decision to defer resolution of Valley's claim to substitute service until Phase II.

The basic phasing order was not timely challenged,[28] nor do we think it could have been opposed successfully, given the imperative need to rule on NEGEA's plan in time for the 1971–72 winter season.[29] As to substitute service, there are indications that the Examiner and the FPC would have decided against Valley if resolution of Valley's claim could not have been deferred.[30] But we do not put our decision on that ground, for we think it was entirely reasonable, so far as Valley's objection was concerned, to defer that matter. This deferral gave Valley an opportunity to amplify the record so as to show that it was in a class that was equitably entitled to better treatment than Tennessee proposed, even though, as Tennessee convincingly showed, neither the certificate nor any contractual obligation bound it to supply Valley with LNG peaking service, or a substitute therefor.

We uphold the ultimate determination on this issue in Tennessee's favor in No. 72–2106, Valley Gas Company v. FPC, issued today, and we there also reject Valley's contention that the delay resulted in an improper shift of the burden of proof. Although deferring Valley's substitute service claim did create some potential procedural problems, we find there was no error prejudicial to Valley Gas.

23. 108 U.S.App.D.C. 409, 283 F.2d 204 (1960), cert. denied 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227.

24. 283 F.2d 204, 214.

25. *Id.* at 210.

26. The gas for NEGEA's LNG service was to come from the longterm supply of up to 54,300 Mcf per day available under contract to Worcester Gas Light Company, a subsidiary of NEGEA. Where the natural gas supply for Tennessee's proposed aboveground storage project would have originated is still unclear.

27. By order issued 25 November 1970 the Commission granted Tennessee's unopposed petition that the proceeding be held in two phases: Phase I to deal with Tennessee's request for abandonment; and Phase II to deal with Tennessee's request for amortization.

28. No party, including Valley, objected to the Commission's phasing directive either before or during the hearing conducted in Phase I.

29. It was necessary to begin operation of the liquefaction plant prior to 1 June 1971 in order to supply LNG for peaking service during the 1971–72 winter season.

30. The Presiding Examiner's order in Phase I provided that the reinstatement of service issue should be left for consideration and decision in Phase II "[i]n fairness to Valley Gas." App., Vol. I, p. 55; Record at 1326. (Emphasis added).

## IV. *Conclusion*

In its approval of the Examiner's decision in Phase I, the Commission properly put great emphasis on the amply supported finding that operation of the facilities by NEGEA presented the prospect of a full, immediate, and less costly use to supply peaking service to the New England consuming public, whereas an order to Tennessee to proceed would have led to further delay of a project already convincingly lacking in market support. Accordingly, the Commission's order is

Affirmed.