**TENNESSEE GAS PIPELINE COMPANY, a Division of Tenneco Inc., Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

Berkshire Gas Company, et al., Intervenor.

**VALLEY GAS COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

Tennessee Gas Pipeline Company et al., Intervenors.

Nos. 72–2101, 72–2106.

United States Court of Appeals, District of Columbia Circuit.

Argued June 6, 1973.

Decided Oct. 2, 1973.

Harold L. Talisman, Washington, D. C., with whom Harry S. Welch, Houston, Tex., and Harry S. Littman, Washington, D. C., were on the brief, for petitioner in No. 72–2101 and intervenor Tennessee Gas Pipeline Co. in No. 72–2106.

Morton L. Simons, Washington, D. C., with whom Barbara M. Simons, Washington, D. C., was on the brief for petitioner in No. 72–2106.

Michael J. Manning, Atty., F. P. C., with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Acting Sol., F. P. C., were on the brief, for respondent.

John W. Glendening, Jr., New York City, was on the brief for intervenors, the Berkshire Gas Co. and others.

Francis H. Caskin, Washington, D. C., entered an appearance for intervenors, New England Gas and Electric Assn. and Air Products and Chemicals, Inc., in No. 72–2106.

Before BAZELON, Chief Judge, and ROBINSON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

This case arises on petitions for review of an Order of the Federal Power Commission which resolved the second phase of the proceedings discussed in Valley Gas Company v. FPC, No. 71–1743, 159 U.S.App.D.C. ——, 487 F.2d 1182, which we decide today.[1] On review

---

1. Under review here is Federal Power Commission's Opinion No. 624, issued 26 July 1972. Appendix, Vol. I, pp. 226–50; Record at 1836–60. (The appendix in No. 71–1743 has been made a part of the record in this case. References to it will be noted as "App. (No. 71–1743)".) The Commission

denied rehearing by an order issued 22 September 1972. App., Vol. I, pp. 295–97; Record at 1909–11. Much of the background of this controversy we discussed in No. 71–1743, so the outline of facts supplied by this opinion will assume familiarity with that case.

of the first phase, this court affirmed a Commission Order which (1) authorized abandonment of a liquified natural gas (LNG) project, and (2) allowed withdrawal of a petition to amend the original certificate for that project. The Order under review here (1) denied the claim of Valley Gas Company (Valley) for reinstatement of alleged losses in level of service, and (2) refused the request of Tennessee Gas Pipeline Company (Tennessee) that its unrecovered losses be amortized (and thereby included in its rate base) as either Research and Development Costs or as Extraordinary Property Losses. Supported by substantial evidence and based on legally appropriate criteria, as it was, the Commission's Order under review here is affirmed.

## I. *Facts*

On 5 May 1965 Tennessee filed an application in Docket No. CP 65–352 for authority to construct and operate an in-ground storage LNG facility designed to render peaking service to eighteen New England customers. On 26 July 1965 the Commission issued a certificate of public convenience and necessity authorizing the construction and operation of the facilities to provide the proposed service.[2] One basis for that approval was the existence of contracts with proposed customers to take such peaking service, at prearranged rates, when the project was completed.

Tennessee's customers had requested construction of these facilities,[3] with a central purpose of relieving themselves of the expense involved in building separate and individual storage facilities to provide "peak-shaving" service. Since the construction of such a large facility would take some time, Tennessee undertook to provide an "Interim General" service (IG) to serve peaking needs, renewable at one year intervals until the LNG facility was completed.[4] When the originally planned and certified facility failed for technological reasons, and Tennessee's proposed alternative met with only lukewarm customer support at necessarily increased proposed rates,[5] Tennessee sought approval to abandon the in-ground LNG project, asked to withdraw its application for amendment of the certificate to allow above-ground storage, and allowed its current one-year interim service to expire.[6] Protesting these actions, which resulted in termination of a supply of 6,900 Mcf of IG gas annually to itself,[7] Valley claims that

---

2. 34 F.P.C. 115–17.

3. The New England customers had urged Tennessee to construct a centralized LNG facility to provide "peaking service" because their engineering consultant had recommended that such a facility would be preferable to the construction of individual peaking plants by each of the distributors. App. (No. 71–1743), Vol III, p. 61.

4. Tennessee's Interim General Service was provided on a year-to-year basis for the 1966–67, 1967–68, 1968–69 and 1969–70 seasons. At the conclusion of each year, the IG rate schedule and each service agreement terminated by their own terms, and the IG rate schedule for the year was cancelled pursuant to the Commission's orders. Record at 1561, 1564.

5. See the court's decision in No. 71–1743, Valley Gas Company v. F.P.C., issued today, for a more detailed discussion of the failure of the original project and Tennessee's proposed alternative.

6. IG was terminated, under the terms of the most recent one-year contract, on 1 November 1970.

7. Although on 16 June 1970 Tennessee notified all of its customers that in light of a sharply deteriorating gas supply situation it could not offer additional gas (IG) service beyond that authorized for 1970–71, it did increase Valley's *General Service* (as well as that for other customers in differing amounts) for that period to 20,150 Mcf per day as compared to 18,800 Mcf per day in 1969–70. As noted above, Valley's approximately 6,000 Mcf per day of Interim General service in 1969–70 expired by its own terms at the conclusion of that year. The Commission authorized Tennessee's 1970–71 additional firm long-term General Service plans by an order issued 22 June 1970, Tennessee Gas Pipeline Company, a Division of Tenneco Inc., 43 F.P.C. 937, 941 (1970). Subsequently, Valley agreed to a reduction in such authorization to 19,995 Mcf per day as part of a settlement wherein Valley was

Tennessee is under a duty to continue supplying some form of substitute service to replace these lost supplies. The Commission disagreed.

With respect to the proper accounting treatment to be given Tennessee's losses, the Commission reversed the Administrative Law Judge's decision, which allowed Tennessee to amortize its net loss of $8,841,744 over a ten year period as a miscellaneous deferred debit. The Commission found that under applicable regulations the loss could not be properly classified as either a Research and Development Cost or an Extraordinary Property Loss. Further, the Commission held that the original certificate conditions agreed to by Tennessee precluded amortization of costs, no matter how characterized, to the extent that the project proved unsuccessful.[8]

## II. *Valley's Claim*

As to whether Tennessee was legally obligated to complete (or replace with an adequate substitute) the LNG project which had foundered on technological and economic shoals, we agree with the Commission's conclusion that there was

no such obligation, either to Valley individually or to the customer group as a whole.

### A. *Interim General Service*

■ Valley attempted to focus the argument on the cancellation, or more accurately, refusal to further extend, Interim General service. This position conveniently overlooks the fact that IG service was specifically intended as merely an interim measure "pending the completion of [the] . . . liquified natural gas facilities."[9] It was designed, for that interim period, "to avoid the expense of constructing peak shaving facilities by the New England customers who expected [LNG] . . . service."[10] IG was quite obviously a necessary incentive for the customers to await completion of the larger centralized project, rather than proceeding with construction of decentralized plants. It also helped to insure the availability of adequate market support (at the originally proposed rates) to justify the central LNG project when it was to be completed.

permitted to abandon certain sales to Blackstone Gas Company. *Valley Gas Company,* 44 F.P.C. 1634 (1970).

8. The pertinent conditions provided:
(E) Upon full development of all facilities authorized herein, Applicant shall notify the Commission of the date when it has delivered, on demand of its customers, the maximum LNG winter contract quantity of gas, or that it has been unable to so deliver this quantity. In the event that Applicant shall have been unable, because of mechanical or operational failure of the LNG facilities, to deliver the maximum LNG winter contract quantity of gas, it shall, in any rate determination, if so directed by the Commission, remove from its rate base an amount which shall be determined by multiplying the net original cost of plant and facilities authorized by a fraction the numerator of which shall be the annual winter contract quantity which Applicant was unable to deliver and the denominator of which shall be the maximum winter contract quantity of 3,032,176 Mcf of gas; provided, however, this said amount may again be included in Appli-

cant's rate base in any rate determination if Applicant can deliver the maximum LNG winter contract quantity of gas during any winter withdrawal period.
(F) In any rate proceeding instituted after the liquefied natural gas facilities certificated have been transferred to gas plant in service, should the "test-period" (as presently defined in the Commission's Regulations) or any part thereof fall prior to the commencement of the full service of 121,454 Mcf per day authorized herein. Applicant shall nevertheless reflect revenues and costs based upon such full service.
(G) Applicant shall not, in any rate proceeding, attempt to assess against any other class of service any deficiency in revenues for rendering the service certificated herein below the cost of service associated with the certificated LNG plant and storage facilities, prepared in the manner shown by Exhibits N and P, Schedule 1 of the application in this proceeding.

9. 36 F.P.C. 585, 586 (1966).

10. 39 F.P.C. 839 (1968).

The IG service was carefully tailored to this temporary purpose. Since the exact completion date of the in-ground project was uncertain, the related IG contracts were explicitly limited to a one year term; the Commission's certificates only "authorized [the IG] as a short-term temporary service on a year-to-year basis." [11] When the LNG project failed, and Tennessee's alternative proved unacceptable, unless Tennessee had a continuing obligation either to proceed with the project or to provide an acceptable substitute, the whole rationale and basis for the IG service disappeared.

### B. *The Certificate*

██ That Tennessee had no general continuing duty to complete the originally certificated project, or to use the liquefaction facilities in some other way to benefit the original customer group, was properly determined by the Commission in Phase I. Permission to withdraw Tennessee's application for amendment of the original certificate, like permission to abandon, was granted on the appropriate "present or future public interest" test.[12] While a certificate of public convenience and necessity does contemplate that the appliant will proceed with the best efforts towards completion of the project and commencement of the proposed service, such a certificate is also subject to the contingency that approved abandonment may, as a general matter, validly cancel that obligation. The certificate neither commands the impossible nor guarantees the unattainable.

██ Valley contends that it suffered special financial hardship as a re-sult of the abandonment, and that as a result the "public interest," as applied to obligations created by the certificate, required that abandonment be conditioned on Tennessee's continuation of some form of substitute service to Valley. While it is undoubtedly within the power of the Commission to so condition abandonment approvals in appropriate circumstances, refusal to do so here was neither arbitrary nor without support in the record.

Valley's plight did not differ materially from that of the other customers. Once the LNG project failed, all of Tennessee's customers were necessarily subjected to differing levels of financial expense in making new peaking service arrangements, depending on their need for such service and the proximity and size of alternative sources. But all, including Valley, succeeded in making adequate arrangements. It was true that some of the old customers were in varying degrees in a better position than others to benefit from NEGEA's project. But it was inevitable that any new ownership and use of the liquefaction plant would result in both different rates and a different customer group. The Commission did not approve NEGEA's plan because it most closely resembled Tennessee's project, but rather because it was the best alternative from the standpoint of all New England gas consumers.

If the certificate created an obligation on Tennessee's part to go forward with provision of a peaking service come hell or a high boil-off rate, then that obligation necessarily extended to all customers alike.[13] Such a conclusion would necessarily imply that rights originally created by this certificate of public con-

11. Record at 1853.

12. We affirmed that determination in No. 71–1743.

13. Intervenors, the Berkshire Gas Company, et al., so argue. The certificate made no special conditions as to any given customer. Their contracts were the same. Though most of the customers did not oppose abandonment, the Administrative Law Judge found that Valley "has failed to show exceptional need for additional gas supply as compared with the other customers." Record at 1637. (To the extent that this suggests an incorrect allocation of the burden of proof, note that the Commission specifically recognized Tennessee's primary burden in affirming the Administrative Law Judge's decision. Record at 1855).

venience and necessity could not be cancelled by later developments which altered the present or future public interest when they occurred. We hold to the contrary in No. 71–1743.

### C. *The Contracts*

■ If the original certification of Tennessee's in-ground storage LNG project did not operate to give Valley a continuing or special right to the expected level of service, then the only remaining basis for Valley's claim is an argument that Tennessee had some contractual duty to supply the gas. As discussed above, no such contractual duty existed with respect to continuation of the IG service—since the contracts applicable thereto were specifically limited to one-year's duration. In addition, while a pipeline and its customers no doubt could contract to assure a guaranteed gas supply without regard to the successful construction of a proposed physical plant, the contracts entered into with respect to Tennessee's proposed LNG peaking service established no such right or guarantee.

All the prospective customers signed agreements to take LNG service, a show of market support at the proposed volume and rates which was no doubt helpful in obtaining original certification. However, all those contracts specifically provided that Tennessee would "be under no obligation to deliver" (nor would the customers be under obligation to take) gas "until the expiration of thirty days after [Tennessee] . . . noti-

fied [the customer] . . . in writing that [Tennessee] . . . is ready to commence the delivery of such new quantities of gas." [14] Such notice was never sent, because of the technological failure of the project. Although such a contract entails an implicit obligation on Tennessee's part to attempt completion in good faith, there was no evidence of malingering. As with the certificate, the contracts involved were just not designed to repeal any laws of nature which got in the way.

### D. *Reliance*

■ Nor did Tennessee act in any improper way to mislead Valley or raise false hopes. The failure of the in-ground project was evident to all by March of 1969.[15] This in itself should have alerted Valley that the IG service, which was designed as merely a stop-gap measure, was in jeopardy. As early as 17 October 1969 Tennessee formally notified its customers that it would not offer IG service for the 1970–71 winter.[16] As late as the 1969–70 season, Tennessee was not limiting the availability of firm General Service to its customers. Yet Valley declined to contract for such base-load long-term service. Having made other arrangements for peaking gas, Valley is now asking that the "substitute service" it requests take the form of firm General Service. To the extent that Valley's claim is for the fulfillment of its expectations, the very nature of its requests may be a revealing indication of the actual use to which Valley put the IG service while it was still available.

---

14. Record (No. 71–1743) at 603.

15. A representative of Tennessee met with the customers in March of 1969 to explain the necessity for modification of the project and increasing the proposed rates. He also indicated at that time that lack of market support for the amended proposal would force total abandonment. By June of 1969 the customers were notified that inadequate support was forthcoming and that Tennessee planned to abandon the project. App., Vol. II, p. 813.

16. The general gas shortage situation renders Tennessee's decision not to supply *additional* unobligated service quite reasonable.

Tennessee had turned down requests of existing contracted demand customers for increased services totalling in excess of 450,000 Mcf per day for 1971–72. App., Vol. I, p. 113; Record at 1636. Indeed, since Tennessee's notice to its customers on 16 June 1970 that additional commitments would not be made, many pipelines have been unable to meet existing service obligations, and more than twenty pipelines now have cases pending before the Commission involving plans for curtailment of service. *See* Utilization and Conservation of Natural Gas, Docket No. R. 467, Order issued 8 January 1973, 38 Fed.Reg. 1517 (1973).

If Valley's "reliance" was in reality tied to its need for and expectation of "peaking service," it had considerable advance notice of the need to make other arrangements, and actually did so. If, as seems likely, Valley's reliance was tied to the hope that it could continue to use IG service as a supplement for its base load demand, rather than its short-term peak demand needs, then Valley is merely suffering now from its own inappropriate use of the IG gas. It is important to remember that the whole purpose of the LNG project, *and* the fill-in IG service, was to provide a substitute for other peaking arrangements. Neither was ever intended (as opposed, perhaps, to used) as a substitute for General Service, which is a base load, year-round service rendered on a long-term basis. There is no explanation in the record as to why the IG service was so structured that it could be used year round.[17]

There is reason to believe that Valley's failure to convert to General Service while that was possible, and its reliance on IG service to meet base load demand (until caught out by the termination of that service under its own terms), was not based on any plausible construction of the conditions attaching to IG, but rather on a desire to squeeze the last possible economic advantage out of the rate structure—legitimate, but hazardous, given the risks attaching to such a course. One legitimate function of any peaking service is to lower rates by lessening the impact of the highest demand days on the "demand charge" levied in the succeeding twelve months. Since the IG service began afresh each November, the demand charge as to that gas calculated on the basis of the greatest amount supplied during any day in that contract year. Assuming the highest day fell in January or February, Valley paid the highest demand charge for only nine or ten months of the year (until the next contract termination date).[18] If IG was used, not for purely peak demand, but in large amounts year round, a substantial saving might thereby be made. In contrast, if Valley had contracted for firm long-term General Service for its regular base load needs, no such advantage could have been obtained. So the one-year term of IG service, which Valley now asserts is not to be taken literally, was not most likely viewed as a definite advantage for Valley at the time the IG service was still in effect.

In short, both the early warnings of trouble and Valley's economic motivation for failing to contract for General Service while that was still available belie, at least as to justified reliance, its claim that it would have obtained a full supply of gas under the General Service schedule, had it not been for Tennessee's proposal of the LNG project and the interim availability of IG gas.

### E. *Burden of Proof*

Finally, Valley contends that the burden of proof on the issue of "substitute service" was improperly shifted from Tennessee to Valley as a result of deferral of that question to Phase II of the proceedings. To the extent that Valley is claiming that the abandonment did not meet the "public interest" standard, unless conditioned on provision of additional service to itself, we must agree that the burden to refute that claim rested on Tennessee, the applicant for abandonment authority.[19] However, contrary to Valley's contentions, we find that the burden was in fact correctly allocated.

Although he did not rule on the question, the Examiner in Phase I clearly felt that Tennessee had made a persuasive showing that Valley was not en-

---

17. One possible answer is that, given industrial uses, there was no guarantee that the highest demand day would result from peak winter demand for heat.

18. App. (No. 71–1743), Vol. III, pp. 468–69.

19. Michigan Consolidated Gas Company v. F.P.C., 108 U.S.App.D.C. 409, 419, 283 F.2d 204, 214 (1960).

titled to relief. Despite that conclusion, *for Valley's benefit,* he delayed resolution of the substitute service issue and directed that *"Tennessee should show cause* in Phase II of the proceeding why it should not provide the additional interim gas service desired by Valley Gas." On review of the Administrative Law Judge's decision in Phase II, the Commission explicitly found that in Phase II "Tennessee satisfied the Examiner's directive" to show cause "and went forward at the hearing with a persuasive presentation." [20]

It is true that the Commission also noted that "the burden of proof . . . remained upon Valley as to the alleged undue discrimination . . . and Valley has not shown that it is being unduly discriminated against." [21] Valley cites this language as an indication that the burden of proof was improperly switched. Yet, to the extent that Valley's claim alleged wrongful conduct or breach of contract on Tennessee's part, rather than asserting substitute service was required by the public interest standard applicable generally to the question of abandonment and its consequences, Valley *should* have borne that burden.

Read as a whole, and in context, the challenged Order reveals that the Commission merely separated out the two possible interpretations of Valley's claim, bent over backwards to require Tennessee to make a second showing on the abandonment-related argument, and correctly put Valley to its proof on the arguments which remained after the general public interest test had been applied, to Valley's detriment, on the abandonment-related question.

### III. *Accounting Treatment for Tennessee's Unrecovered Losses*

 In its own petition for review, Tennessee challenges the Commission's order to the extent that it reverses the decision of the Administrative Law Judge and refuses to allow amortization (and, consequently, rate-base treatment) of the. unrecovered costs related to the Hopkinton LNG project. Tennessee seeks to have these costs included in its rate base as either Research and Development expenses or as Extraordinary Property Losses. While disputing those characterizations, the Commission found that Tennessee's claim for rate base treatment was in any event barred by specific conditions included in the original certificate and accepted by Tennessee. Without attempting to delve into the questions raised by the specific characterization claimed to allow amortization, we hold that the restrictions in the original certificate were properly construed to bar inclusion of these unrecovered costs in Tennessee's rate base.

When the original certificate of public convenience and necessity was issued for the LNG project, the Commission included, at the request of several intervenors and with Tennessee's consent, specific restrictions which were essentially designed to deny future rate base treatment to the cost of the proposed facilities to the extent that they proved unsuccessful. Specifically, clause (E) provided, in pertinent part, that

> [i]n the event that Applicant shall be unable, because of mechanical or operational failure of the LNG facilities, to deliver the maximum LNG winter contract quantity of gas, it shall, in any rate determination, if so directed by the Commission, remove from its rate base an amount which shall be determined by multiplying the net original cost of plant and facilities authorized by a fraction the numerator of which shall be the annual winter contract quantity which the Applicant was unable to deliver and the denominator of which shall be the maximum winter contract quantity. . . .

If this formula is applied to a total failure to provide gas, the result is that the Commission may direct exclusion of all costs from Tennessee's rate base. By

---

20. App., Vol. I, p. 245; Record at 1855. 21. Ibid.

denying Tennessee's request for amortization, the Commission has done so.

Tennessee argues that these conditions were not meant to pre-judge the appropriate accounting treatment in this case. To the extent that the Commission was intended to exercise its discretion at the time of decision on the rate treatment to be given such costs, and could interpret or indeed modify or refuse to enforce the certificate decisions where warranted, we agree. However, the Commission has *now* judged the impact of these restrictions in the light of both past expectations and present circumstances. In interpreting its own prior certificate and its present statutory duty, a determination to which this court must give suitable deference, the Commission has come to a conclusion which we see no reason to disturb.

Although it is arguable that the conditions did not explicitly foresee the possibility of total failure of the LNG project, their clear intent was that rate base treatment should turn on the level of successfully delivered service. Tennessee's resolution of any latent ambiguity would embrace the absurd result that, while a mere 1% success rate would allow the Commission to deny 99% of the costs rate base treatment, total failure somehow opens the way for complete amortization. The basic intent behind these conditions, as accepted by Tennessee, can be gleaned from their origination with intervenors, who wished to protect the integrity of the pipeline's system-wide rate structure by barring rate base impact on those who would not benefit from the project.[22] Despite any position later taken by some of Tennessee's New England customers, it would be irrational to hold, on the basis of language so originating, that while Tennessee, which planned and controlled the facilities, was not guaranteeing to its independent customers the success of the project, the customers were making such

a sweeping guarantee *to Tennessee*. The Commission's reading of the certificate conditions is eminently reasonable.

## IV. *Conclusion*

The failure of Tennessee's planned LNG facilities gave rise to regrettable dislocations for all of the parties involved. In essence, the Commission's determinations under review here and in No. 71–1743, decided today, were based on the conclusion that the applicable contracts, regulations, certificates and statutes combined to require that the facilities be committed to the most desirable future use and that the various losses rest where they fell. We find the Commission's reasoning, and the result reached, to be quite sound. Accordingly, the Commission's Order is

Affirmed.

---

22. The Commission's original Order notes that the intervenors waived a formal hearing on condition that restrictions substantially "equivalent to those in [its] order of July 3, 1963, Transcontinental Gas Pipe Line Corporation, Docket No. CP 63–228, 30 F.P.C. 38" were imposed. App., Vol. I, p. 233; Record at 1843.