Billy J. McCOMBS et al., Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent,

United Gas Pipe Line Company,
Intervenor.

No. 75–1829.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted April 15, 1976.

Decided Oct. 18, 1976.

Stanley L. Cunningham of McAfee, Taft, Mark, Bond, Rucks & Woodruff, Oklahoma City, Okl. (Philip D. Hart and Terry R. Barrett, Oklahoma City, Okl., with him on the brief), for petitioners, Billy J. McCombs et al.

Jerome Ackerman of Covington & Burling, Washington, D.C. (Nicholas W. Fels, Washington, D.C., with him on the brief), for petitioner, E. I. du Pont de Nemours & Co.

Thomas M. Walsh, Atty., Federal Power Commission, Washington, D.C. (Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, Allan Abbot Tuttle, Sol., Federal Power Commission, Washington, D.C., with him on the brief), for respondent.

Platt W. Davis III, of Vinson, Elkins, Searls, Connally & Smith, Washington, D.C. (Barbara S. Blaine, Washington, D.C.; J. Evans Attwell of Vinson, Elkins, Searls, Connally & Smith, William B. Cassin and Larry J. Gunn, Houston, Tex., and Knox Bemis of Sharon, Pierson, Semmes, Crolius & Finley, Washington, D.C., of counsel, with him on the brief), for intervenor, United Gas Pipe Line Co.

Before HILL and SETH, Circuit Judges, and TEMPLAR, Senior District Judge.*

SETH, Circuit Judge.

This is a proceeding to review Opinions Nos. 740, 740–A, and 740–B of the Federal Power Commission entered in its docket No. CP74–94. The orders were stayed by this court on December 9, 1975.

The issues on this review concern two sections of the Natural Gas Act, Sections 7(b) and 7(c) [15 U.S.C. §§ 717f(f) and 717f(c)]. The Commission found that the petitioners had violated the Act by failing to deliver gas to United Gas Pipe Line Company. The petitioners' contention that there was an abandonment under Section 7(b) was thus found to be without merit by the Commission.

The factual background must be described at some length. In May 1948, B. C. Butler, Sr. et al. executed an oil and gas lease to W. R. Quin (the Butler B lease) covering approximately 163 acres (the Butler B tract) in Karnes County, Texas.

Under a Gas Purchase Contract dated April 29, 1953 (the 1953 Gas Purchase Contract), the leaseholders agreed to sell and deliver to United Gas Pipe Line Company "merchantable natural gas . . . produced from all wells now or hereafter drilled" on the Butler B tract plus "seller's proportionate part of all merchantable natural gas produced from any well or wells located on any unit or units" which include any portion of the Butler B tract.

Following the *Phillips* decision, Quin filed application with the Federal Power Commission for producer certificates. On December 8, 1954, the Commission issued certificates to Quin authorizing the sale, and continued sale, of the natural gas in interstate commerce. The lease was transferred several times.

The Butler B lease was eventually assigned to H. A. Pagenkopf. On June 19, 1963, the Commission ordered termination of the 1954 certificates and issued a new certificate in Docket No. G-12694 authorizing Pagenkopf to continue the service which had been initiated by Quin.

In 1966, Pagenkopf assigned the lease to L. H. Haring, Jr., who, in turn, engaged Bay Rock Corporation as operator. Haring notified United of the assignment, stating that he would make appropriate filings with the Commission reflecting the change in ownership. He never made such filings.

* Of the District of Kansas, Sitting by Designation.

At the time of the Pagenkopf-Haring assignment, there was one well on the Butler B tract, the Butler No. 7 Gas Well, which was completed at approximately 2,900 feet, but was not then producing. Haring unsuccessfully attempted to establish production from the well, but all production ceased on May 28, 1966. On December 5, 1966, Haring and Bay Rock notified United that the well was depleted and no more gas was available "at this time." United acknowledged the depletion and removed its equipment but advised that it would reinstall its equipment whenever Bay Rock might have further gas to deliver under the contract. Bay Rock did not seek or obtain Commission authorization to abandon its sale to United.

Nothing further occurred with the Butler B tract until 1971 when Haring transferred his working interest rights in certain deep reservoirs in the acreage to National Exploration Company and the McCombs Group. On November 1, 1971, Haring assigned a working interest in the west 50 acres of the 163-acre Butler B tract from a depth of 4,115 feet to 8,700 feet to National Exploration pursuant to a prior agreement under which the 50-acre interest was unitized by National Exploration with its interest in 302 adjoining acres. National Exploration was unaware at the time of the assignment of United's interest in the Butler B tract. On October 22, 1971, the McCombs Group acquired a working interest in the remaining 113 acres of the Butler B tract between 6,500 feet and 8,653 feet. On November 1, 1971, the McCombs Group designated as the McCombs-Butler Gas Unit No. 1 their interests embracing the east 113 acres of the Butler B tract and the adjoining 150 acres of the Butler A tract at the levels noted. On April 1, 1972, the McCombs Group acquired from Haring a working interest in the entire 163-acre Butler B tract between the depths of 8,700 feet and 9,700 feet. On April 3, 1972, the Group designated as the McCombs-Butler Gas Unit No. 2 their interests embracing the 163-acre Butler B tract and the adjoining 150-acre Butler A tract at the levels noted.

The McCombs Group thereupon began drilling. Relying on a 1967 title opinion which failed to show United's possible interest in the Butler B lease, the Group in September 1971 drilled Butler No. 1 Well in the Butler A tract which produced gas from the McCombs-Butler Gas Unit No. 1. McCombs then contacted United, among others, to negotiate a sale of the gas. By letter dated November 19, 1971, United inquired into the source of the Group's leases. While the record evidence is in conflict as to the details of these negotiations, they were ultimately discontinued. As noted above, the McCombs-Butler Gas Unit No. 1 was designated effective November 1, 1971, and a new title opinion dated December 7, 1971, disclosed United's interest in the Butler B lease.

In February 1972, the Group drilled the Butler No. 2 Well on the Butler A tract which produced gas at depths embraced by the McCombs-Butler Gas Units Nos. 1 and 2. Gas Unit No. 2 was designated on April 3, 1972, but a title opinion dated May 31, 1972, failed to disclose United's possible interest in the Butler B tract.

The McCombs Group had been continuing negotiations for sale of the production and in June 1972 E. I. du Pont de Nemours & Company agreed to purchase all of the gas underlying the Butler A and B tracts for industrial consumption in the intrastate market.

The Group continued drilling operations. In September 1972, the Butler No. 3 Well on the Butler B tract began producing gas at depths embraced by the McCombs-Butler Gas Unit No. 1. At the same time, the Butler Well No. 4 on the Butler A tract produced gas at levels embraced by the McCombs-Butler Gas Units Nos. 1 and 2.

In the meantime, early in 1972, National Exploration drilled two gas producing wells within its allocated depths on the west 50 acres of the Butler B tract. United sought to purchase the gas in April 1972. In the course of preparing the sale, National Exploration notified United that they believed the company's working interest in the 50 acres of the Butler B tract might be subject

to United's 1953 Gas Purchase Contract. United thereupon undertook a title search relative to the Butler B tract and in late May 1973, learned of its interest. On June 6, 1973, United notified the McCombs Group of its claim under the 1953 contract.

The Group responded by filing a lawsuit in the District Court of Karnes County, Texas, seeking a declaratory judgment that the Quin-United contract did not entitle United to Butler B gas. The proceeding was removed to the United States District Court for the Western District of Texas where it is being held pending the outcome of these proceedings.

By subsequent agreement, National Exploration agreed to sell its portion of Butler B gas to United and it is no longer a party to the proceedings.

On October 9, 1973, United filed a complaint with the Federal Power Commission alleging that the McCombs Group was violating the Natural Gas Act and requesting the Commission to issue an order requiring the Group to show cause why they were not in violation of the Act. United also asked the Commission to order the Group to deliver to United volumes equivalent to those which had been diverted from the interstate market to du Pont. McCombs filed its Answer and a Motion to Dismiss or Defer the Action, in which it denied violating the Act and moved to dismiss the petitions, or to defer the proceedings pending the outcome of the court litigation which challenged the validity of the Quin-United contract.

On November 27, 1973, the Commission issued a show cause order (JA at 89–92) requiring the Group to appear at hearings and to show cause why they should not be held in violation of Section 7 of the Natural Gas Act; why they should not be required to file applications for certificates of public convenience and necessity as successors in interest; why they should not be required to deliver to United in compliance with the contract provisions volumes equivalent to those withheld from the interstate market; and why they should not be required to cease and desist from the sales then being made in the intrastate market.

On December 12, 1973, the Commission denied McCombs' motions to dismiss or defer the proceedings (JA at 93–95), noting that the validity of the Quin-United contract was irrelevant to the Commission's determination of obligations under the Natural Gas Act.

Hearings commenced before an administrative law judge on January 10, 1974, and ended on February 14, 1974. On April 26, 1974, the presiding judge issued his initial decision (JA at 103–117). The judge concluded that "the service authorized and the gas supply dedicated by the certificates involved herein [Pagenkopf's successor producer certificate, FPC Docket No. G–12694] include any and all gas produced from the Butler B acreage" and, consequently, the unauthorized intrastate sale of that gas violated the Natural Gas Act. Additionally, he concluded that however negligent United may have been in asserting its rights, and however innocent McCombs may have been, the Group should be required to cease and desist from continuing the sales and to file applications under Section 7 for authority to make new sales. Finally, the judge held that the record was inadequate for determining the volumes attributable to the Butler B lease which were diverted and reserved all questions of appropriate remedy until McCombs filed applications for new certificates. Exceptions to the decision were filed by both parties.

On August 20, 1975, the Commission issued Opinion 740 (JA at 129–171), affirming the initial decision of the administrative law judge. The Commission held that Sections 7(b) and 7(c) of the Natural Gas Act, considered together, required the continuation of certificated service. Relying on that principle, it concluded that the certificate issued to Pagenkopf required the McCombs Group to sell Butler B gas to United.

On September 10, 1975, the McCombs Group filed an Application for Rehearing and a Motion to Stay (JA at 173–189). In response to the issues raised in the application for rehearing, the Commission issued Opinion 740–A on November 7, 1975 (JA at 232–250), which dealt with a settlement

proposal not here considered, and directed that evidence be taken as to it. On January 19, 1976, the Commission issued Opinion 740–B (JA at 252–261), which denied United's application for rehearing of Opinion 740–A. The Commission affirmed its earlier decision on the points raised preferring fuller development of the record. It also treated several other issues not here concerned. All three Opinions, 740, 740–A, and 740–B, are currently stayed by order of this court issued December 9, 1975. Evidentiary hearings before the administrative law judge continue in accordance with the Opinions.

Appellant McCombs raises several points on appeal, the most important of which is a challenge to the Commission's holding that abandonment authorization and recertification was necessary for sales of gas by McCombs in the Butler B tract.

Of these several issues raised on this appeal, we will only consider what appears to be the basic one, and that is the matter of abandonment.

To consider again some of the facts outlined above as they relate to this issue, the one producing gas well on the Butler B lease ceased producing early in 1966. The lease was assigned by Pagenkopf effective in March 1966, and the assignee, Haring, attempted to work over the well. During this work, about 3,000 Mcf was produced, but all production again ended in May 1966. The operator for Haring advised the gas purchaser, United, in December 1966 that the well was depleted. United thereafter in 1966 removed the equipment it had connected to the well. Thus, the only producing gas well was abandoned in the fall of 1966. The operator and the purchaser recognized that there could be no more gas delivered from the well. This was a physical fact beyond the control of either of them, and they recognized the realities of the situation. The operator or owner had tried to restore production but was unable to do so. The sellers and buyers wished to continue the sale and purchase of gas but could not do so. The record does not show that any gas was ever produced thereafter

from this original well. The witness Haring who was the owner who attempted the workover, and who was a petroleum geologist, testified:

"Certainly I was not aware of the gas reserves at deeper levels when the gas production ceased in 1966, and, as far as I know, neither United nor anyone else was aware of its existence."

In August 1968, the FPC wrote a letter to Pagenkopf suggesting that he file an application for abandonment. By an undated letter the Commission made a similar suggestion to the operator for Pagenkopf's successor, Haring. The FPC thus twice recognized that there had been no production for an extended time, and recognized that the abandonment should be formalized for its records. This must be acknowledged as a recognition by the Commission that there was in fact an abandonment, but there was something needed for the record. The records of the FPC as to this matter have apparently been destroyed under its procedures; consequently, it is not known what they may have indicated as to abandonment. The Commission in Opinion No. 740 in footnote 2 states as to the original proceedings for certification: "Our records indicate that Docket Nos. G–2997 and G–2998 were destroyed in 1964." It is apparent however from the testimony that no operator or owner filed a formal application to abandon.

Thus we have a situation where there was an abandonment as a recognition of the indisputable physical facts beyond anyone's control. The Commission participated in this recognition as there were at least two suggestions by the Commission that someone file something to tidy up the records. These letters from the Commission must be taken, in view of the destruction of the supporting records, to be an acknowledgment that there was an abandonment. It is difficult to see how a formal application, and a decision by the Commission could have added anything to these letters. In these circumstances, we must hold that there was an abandonment which was rec-

ognized by the Commission, and its jurisdiction ended.

Thus we must hold as a matter of law that there was an abandonment sufficient under Section 7(b) of the Natural Gas Act. This being a matter of law, we do not consider it within the expertise of the Commission.

The "abandonment" we refer to is that contemplated under Section 7(b) of the Act, as above indicated. This is the only "abandonment" which is applicable to these circumstances. Section 7(b) refers to "service rendered," and the ordering of further "service" would have been a futile gesture. The seeking of an application by the Commission was a recognition of the fact that no more gas could be delivered from the only gas well, and that the "service rendered" had long since ceased contrary to everyone's wishes. This action by the Commission thus could only have reference to Section 7(b).

■ We have examined the relationship between service and certification insofar as the Court did in *Sun Oil Co. v. Federal Power Comm'n,* 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639; *Sunray Mid-Continent Oil Co. v. Federal Power Comm'n,* 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623; *United Gas Pipe Line Co. v. Federal Power Comm'n,* 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d 181, and in *Atlantic Refining Co. v. Public Service Comm'n,* 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312, and find no guidance as to the basic issue here presented. It is obvious from these decisions and from the Natural Gas Act that the Commission can and must prevent the termination of interstate service being rendered. This is no more than basic public utility doctrine, but when there is no service, and has been none for the several years here concerned by reason of depletion, there is no place for the application of the doctrine. The "service" is not the lease. *See Federal Power Comm'n v. Panhandle Eastern Pipe Line Co.,* 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499, and *United Gas Improvement Co. v. Continental Oil Co.,* 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466.

We stated in *Harper Oil Co. v. Federal Power Comm'n,* 284 F.2d 137 (10th Cir.), that:

"It would thus seem clear that when once an independent producer of gas has dedicated his production to interstate commerce and thereby has come under the jurisdiction of the Commission, he remains thereunder so long as production continues. (Citing *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333)."

The determination of the abandonment issue is thus related to service and to production and not to leases. Again it would seem sufficient to rely upon the physical facts plus the recognition by the Commission of the realities of the situation.

It is also important to consider the statement of the Commission in Opinion No. 740 where it said:

"And they are undoubtedly correct in their assertion that the purpose of Section 7(b) is to require the continuance of service once it has been commenced and the public has relied on it, and further, that Section 7(b) could not as a practicable matter have served that purpose when natural gas service from the Butler B tract was discontinued in 1966 . . . "

■ The Commission in this case has thus construed Section 7(b) abandonment to be in order when the only well delivering gas from the only known horizon has ceased to produce for an extended period by reason of depletion, and workover attempts have failed to restore production. The abandonment was thus a fact and the solicitation of the producer to formalize it for the records is a sufficient indication that it was abandoned under Section 7(b).

All orders included in Opinions Nos. 740, 740–A, and 740–B are set aside, and the case is remanded with directions that other pending proceedings in FPC Docket No. CP74–94 based on such orders be terminated and the proceedings be dismissed.

IT IS SO ORDERED.