**PHILLIPS PETROLEUM COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

No. 76–1216.

United States Court of Appeals,
Tenth Circuit.

May 17, 1977.

John L. Williford, Bartlesville, Okl. (C. J. Roberts and Larry Pain, Bartlesville, Okl., on the brief), for petitioner.

Scott M. DuBoff, Washington, D. C. (Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, and Allan Abbot Tuttle, Sol., Washington, D. C., on the brief), for respondent.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

◾ The ultimate issue to be resolved is whether the Federal Power Commission correctly determined that the natural gas reserves underlying a sales contract executed in 1975 between Phillips Petroleum Company and United Gas Pipe Line Company were reserves that had been sold and thereby dedicated in interstate commerce in 1972 and were because of that fact ineligible for the $.52 per thousand cubic feet (Mcf) rate established in Opinion No. 699–H, such opinion relating to "the sale of gas not previously sold in interstate commerce prior to January 1, 1973." We conclude that the Commission's order was correct, and accordingly we affirm.

Phillips had a 50% interest in the so-called Oden V. Young lease in Panola County, Texas, with Kerr-McGee Corporation owning the other 50% interest. We are here concerned with Phillips' interest only. On May 25, 1971, Phillips entered into a farmout agreement with Goldston Oil Corporation, pursuant to which Goldston, at its own risk and expense, agreed to drill a test well on the leasehold. A successful well, the K. Young well, was completed within one month, and, as the farmout agreement provided, Phillips thereafter assigned "all of its right, title and interest" in the Young lease to Goldston. Phillips only excepted from that assignment and reserved for itself a one-eighth overriding royalty.

On March 10, 1972, Goldston entered into a 20-year contract with United Gas Pipe Line for the sale of the entire production from the K. Young well. The purchase price provided in the contract between Goldston and United was $.24 per thousand cubic feet (Mcf) as authorized in the Other Southwest Area Rate established by the Commission in Opinion No. 607, such rate being in force and effect as of the date of the contract, March 10, 1972. Goldston's sale to United was approved by the Commission by the issuance of appropriate certification.

In its Opinion No. 699–H the Commission established a new nationwide rate structure for producers' sales of natural gas in interstate commerce. That "new gas" rate, then set at $.52 per Mcf, applies to sales falling in any one of the following three categories: (1) Sales made from a well or wells commenced on or after January 1, 1973; (2) sales made pursuant to a contract executed on or after January 1, 1973, "for the sale of natural gas in interstate commerce for gas not previously sold in interstate commerce," except under short-term or emergency sales procedures of the Commission's regulations; or (3) sales made pursuant to a renewal contract, if the sales were formerly made pursuant to a permanent certificate of unlimited duration under a contract that expired by its own terms, and if either the renewal contract was executed or the original contract expired on or after January 1, 1973.

Under the Phillips-Goldston farmout agreement, Phillips also had an option to convert, under specified circumstances, its one-eighth overriding royalty to a working interest equal to 40% of Goldston's leasehold. That option clause provides as follows:

> When the proceeds or value of the production from the well after the payment of all taxes, royalties and overriding royalties, including the overriding royalty retained [by] Phillips, shall equal the total cost of drilling, testing, completing and equipping the well plus the cost of operating and maintaining the well during

said payout period, Second Party [Goldston] shall so notify Phillips in writing. Phillips shall have thirty (30) days after receipt of said notice within which to elect:

> (a) To convert its overriding royalty interest to a working interest; or

> (b) To continue its overriding royalty interest retained in said well.

The K. Young well paid out on June 21, 1974, and Phillips exercised its option to convert its overriding royalty to a working interest. Goldston, accordingly, assigned back to Phillips an undivided 40% interest in the leasehold, and Phillips released its overriding royalty. Then, on June 12, 1975, Phillips entered into a contract with United for the sale of gas from its 40% interest in the K. Young well. That contract expressly adopted all the terms and conditions of the earlier contract between Goldston and United, except as concerned the price to be paid.

Subsequently, on July 30, 1975, Phillips filed with the Commission an application for a certificate of public convenience and necessity authorizing its sale to United. On August 21, 1975, Phillips supplemented its application with a request for a temporary certificate. In its application and supplement Phillips stated that the rate for Phillips' proposed sale to United would be:

> [T]he nationwide ceiling prescribed by Opinion No. 699–H [$.52 per Mcf] inasmuch as the proposed sale will be made pursuant to a contract for the sale of gas in interstate commerce for *gas not sold in interstate commerce prior to January 1, 1973.* (Emphasis added.)

By letter order issued November 20, 1975, the Commission granted Phillips' request for temporary certification, but denied Phillips' further request that it be permitted to charge United at the new rate of $.52 per Mcf as permitted by Opinion No. 699–H. The applicable rate, according to the Commission, was the so-called "old gas" rate of $.24 per Mcf as permitted by Opinion No. 607. The Commission's reasoning was that the gas which Phillips proposed to sell to United had previously been sold and dedicated to interstate commerce by the March

10, 1972, contract between Goldston and United, and hence the gas to be sold by Phillips to United did not qualify for the "new gas" rate since the contract between Phillips and United was *not* "for the sale of natural gas in interstate commerce for gas not previously sold in interstate commerce. . . ."

Phillips filed an application for rehearing of the Commission's letter order, arguing that the interest to which it became entitled in 1974 by the exercise of its option was separate and distinct from the gas reserves which Goldston had previously dedicated to interstate commerce by its sale to United on March 10, 1972, and that therefore Phillips' sale to United in 1974 was a sale of natural gas "not previously sold in interstate commerce" and accordingly was entitled to be sold at the "new gas" rate of $.52 per Mcf. The Commission denied Phillips' application for rehearing in its Opinion No. 750. Phillips then filed in this Court a petition to review Opinion No. 750. As indicated at the outset, we affirm the Commission's order.

Phillips' contract of sale with United was entered into on June 12, 1975, and it is Phillips' basic argument here, as it was before the Commission, that the contract calls for the purchase and sale in interstate commerce of natural gas "not previously sold in interstate commerce." Therefore, according to Phillips, it was entitled under Opinion No. 699–H to sell the natural gas at the "new gas" rate of $.52 per Mcf. In our view the fundamental flaw in this argument is that the natural gas which Phillips proposed to sell to United *had* been previously sold in interstate commerce by Goldston.

Under its March 10, 1972, contract with United, Goldston began delivering to United *all* of the natural gas production for the Young lease. This contract included current production and underlying gas reserves. *Hunt v. F. P. C.*, 306 F.2d 334 (5th Cir. 1962), *rev'd. on other grounds*, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964). This delivery was duly certified by the Commission and the price was set at the then prevailing rate of $.24 per Mcf as authorized by Opinion No. 607. These deliveries by Goldston to United constituted both a sale pursuant to contract and a "service" obligation in interstate commerce. The service obligation arises under the requirements of the Natural Gas Act, because a service in natural gas to be carried interstate cannot commence without a certificate of public convenience and necessity issued pursuant to 15 U.S.C. § 717f(c) and (e), *Sunray Mid-Continent Oil Co. v. F.P.C.*, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960). Moreover, once such service begins it cannot be discontinued without Commission authorization under 15 U.S.C. § 717f(b). *Atlantic Refining Company v. Public Service Commission of the State of New York*, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

It was on this general basis that the Commission concluded that the gas which Phillips sought to sell to United at the higher rate was a part of the underlying gas reserves previously sold by Goldston in interstate commerce to United and that by virtue of such sale, the gas had been dedicated to interstate commerce. The Commission further concluded that Phillips' subsequent attempt to sell the same gas to United at the higher rate constituted a reduction or abandonment of the prior dedication which could not be done without first obtaining an abandonment authorization. 15 U.S.C. § 717f(b). We generally agree with the Commission. In our best judgment the gas which Phillips seeks to sell to United at a higher rate simply cannot be classified as gas "not previously sold in interstate commerce." It had previously been sold in interstate commerce by Goldston, and hence did not qualify under Opinion No. 699–H for the higher rate.

It is Phillips' position that the order of the Commission does violence to the law of real property. In this regard counsel asserts that an after-acquiring property owner, such as Goldston, cannot bind or encumber a reserved property interest of his predecessor, namely Phillips. Hence, argues Phillips, Goldston could not deal with

or in anywise encumber the reserved interest of Phillips, and that when Phillips decided to exercise its option and convert its overriding royalty into a working interest there was somehow created "new gas" which was entitled to be sold at the higher rate. We do not agree with this reasoning, nor do we believe that the Commission's order makes shambles out of the law of real property.

When Goldston successfully completed the K. Young well, Phillips, under the terms of the farmout agreement, was required to assign to Goldston *all* of its right, title and interest in and to the Young lease. This Phillips did. So, at that point in time, Goldston owned the *entire* leasehold interest, subject to Phillips' reserved one-eighth royalty. And this was also the situation when Goldston later sold *all* its production to United in 1972.

■ It is true that the farmout agreement further provided that if and when the well "paid out" to Goldston, Phillips had 30 days within which to convert its overriding royalty to a working interest, or to continue its overriding interest in the well. However, this contingent right in Phillips to convert at some future and uncertain time its royalty interest to a working interest did not interfere with Goldston's right to deal as it chose with its leasehold interest, of which it was the sole owner on March 10, 1972, when the Goldston-United contract was executed. Phillips' option to convert did not give Phillips any vested interest in the property assigned to Goldston. *R. Olsen Oil Co. v. Fidler*, 199 F.2d 868 (10th Cir. 1954) and *Morgan v. Griffith Realty Co.*, 192 F.2d 597 (10th Cir.), *cert. denied*, 343 U.S. 934, 72 S.Ct. 770, 96 L.Ed. 1342 (1952). Goldston, having full ownership of the leasehold interest, had the right to dedicate, which it did, its entire interest to interstate commerce under the 20-year contract with United. Accordingly, when Phillips in 1974 determined to convert its royalty interest into a working interest and Goldston, in accord with the farmout agreement, reconveyed to Phillips a 40% working interest, Phillips was bound by Goldston's dedication,

including the $.24 per Mcf rate ceiling. See, for example, *American Refining Co. v. Tidal Western Oil Corporation*, 264 S.W. 335 (Tex.Civ.App.1924) and *Graham v. Omar Gasoline Co.*, 253 S.W. 896 (Tex.Civ.App. 1923).

■ In this Court Phillips relies heavily on the reasoning in an earlier opinion of the Commission, Opinion No. 638, *El Paso Natural Gas Company v. Bass*, 48 F.P.C. 1269 (1972). In that opinion, the Commission did hold that when the holder of a royalty interest in gas then being sold by the lease developer to an interstate pipeline elects to convert his royalty interest into a working interest, and further intends to then sell the gas to another pipeline, the erstwhile royalty holder is not required to obtain an abandonment authorization before instituting the sale of gas to the other pipeline. Subsequent to *Bass*, the Commission in a series of opinions has been retreating from *Bass*, and in the instant case the Commission for all practical purposes has overruled *Bass*. In so doing we believe the Commission acted properly. It was not bound by its earlier error.

■ Phillips also relies in this Court on the recent case of *Southland Royalty Company v. F. P. C.*, 543 F.2d 1134 (5th Cir. 1976), *petition for cert. granted* —— U.S. ——, 97 S.Ct. 2970, 53 L.Ed.2d 1091 (1977). In our view *Southland* is distinguishable from the instant case on its facts. *Southland* involved a 50-year lease which terminated by its own terms on a date certain when title reverted to the owner of the reversionary interest. In *Southland* the Fifth Circuit held that the holder of the 50-year lease did not have the power to dedicate to interstate commerce gas remaining in the ground at the end of the 50th year of the lease. In the instant case we are concerned with an assignment of the entire leasehold interest, containing no time limitation, and subject only to an overriding royalty interest and a contingent option to convert the royalty interest to a working interest. *Southland* is distinguishable from the present case. *Southland* itself recognizes that a subsequent holder of mineral

rights, who acquires such rights from a former holder who encumbered the estate, acquires it with all of the burdens validly created by his predecessor in interest.

■ As an alternative ground for vacating the Commission's order, Phillips suggests that its 1974 contract with United is a renewal or replacement contract within the meaning of the third category in Opinion No. 699–H and that it is entitled to the new gas rate of $.52 per Mcf. on this basis. In our view of the matter, this particular matter is not properly before us, and we therefore decline to resolve the matter. Such, however, should not be deemed as indicating that we believe that Phillips' contract with United is a true renewal or replacement contract. We are simply not called upon here to pass on that matter.

15 U.S.C. § 717r(a) provides that an application for rehearing of a Commission order "shall set forth specifically the ground or grounds upon which the application is based." Our reading of Phillips' application for rehearing fails to disclose that a renewal or replacement contract was urged as a ground for vacating the Commission's order. In its reply brief Phillips virtually admits that such was the case by stating that though the application may not be a "shining example of draftsmanship," still it is adequate to put the Commission on notice. We do not agree.

15 U.S.C. § 717r(b) provides that no objection to an order of the Commission shall be considered upon judicial review unless such objection was urged to the Commission itself, unless there be reasonable excuse for not doing so. There is no apparent reason why Phillips could not have urged a renewal or replacement contract to the Commission as a ground for rehearing. It is on this basis that we conclude that the renewal or replacement matter is not properly before this Court.

Order affirmed.