570 F.2d 1376
 24 P.U.R.4th 497
 Billy J. McCOMBS, R. James Stillings, d/b/a Gastill Company,
David A. Onsgard, Basin Petroleum Corp., E.I.
duPont deNemours & Company, and Bill
Forney, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, formerly known as
Federal Power Commission, Respondent,
United Gas Pipe Line Company, Intervenor.
 No. 75-1829.
 United States Court of Appeals, Tenth Circuit.
 Argued and Submitted Nov. 14, 1977.
Decided Feb. 9, 1978.
Rehearing Denied April 3, 1978.
 
 Stanley L. Cunningham, Oklahoma City, Okl. (Philip D. Hart, Terry R. Barrett and McAfee, Taft, Mark, Bond, Rucks & Woodruff, Oklahoma City, Okl., on the brief), for petitioners, McCombs Group.
 Nicholas W. Fels, Washington, D.C. (Jerome Ackerman, Washington, D.C., on the brief), Covington & Burling, Washington, D.C., for petitioner, E.I. duPont.
 John J. Lahey, Washington, D.C. (Drexel D. Journey, Robert W. Perdue, Allan Abbot Tuttle and Thomas M. Walsh, Washington, D.C., on the brief), for respondent.
 Knox Bemis, Washington, D.C. (Platt W. Davis, III, Washington, D.C., Barbara S. Blaine, J. Evans Atwell, Houston, Tex., of Vinson, Elkins, Searls, Connally & Smith, Washington, D.C., and Houston, Tex., and William B. Cassin and Larry J. Gunn, Houston, Tex., on the brief), for intervenor, United Gas.
 Before SETH, HOLLOWAY and BARRETT, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 These proceedings come before us for rehearing involving a review of opinions rendered by the Federal Power Commission (FPC) finding that the petitioners (McCombs Group) had violated two sections of the Natural Gas Act, 15 U.S.C. Secs. 717f(b) and 717f(f) by failing to deliver natural gas to United Gas Pipe Line Company (United) under a producer's certificate authorizing the sale and continued sale of gas in interstate commerce. The pivotal dispute is whether the certificate was in force and effect or whether it had been abandoned prior to these proceedings. The FPC found that there had been no abandonment. In McCombs v. Federal Power Commission, 542 F.2d 1144 (10th Cir.1976), authored by Judge Seth, the orders of the Commission involved here were set aside. However, this court granted the Commission's petition for rehearing. Thereafter, on October 18, 1977, this court directed and ordered that the opinion and judgment of October 18, 1976, supra, be withdrawn and vacated. We will refer to and quote from the prior opinion which has been vacated and withdrawn, however, inasmuch as it is reported in 542 F.2d 1144, supra.
 
 
 2
 In 1953, the leaseholders-producers of the Butler B lease covering a 163 acre tract situate in Karnes County, Texas, entered into a Gas Purchase Contract with United whereby the producers agreed to sell to United all natural gas produced then or thereafter from the tract. The producers applied to the FPC for producer certificates which were granted on December 8, 1954, authorizing the sale of the natural gas in interstate commerce.
 
 
 3
 The Butler B lease was assigned on various occasions prior to June 19, 1963, when the FPC terminated the 1954 certificates and issued a new certificate authorizing one H.A. Pagenkopf, then the Butler B lease assignee, to continue the service. This operator assigned the Butler B lease to one Louis H. Haring (Haring), et al., effective March 1, 1966. Haring appointed Bay Rock Corporation (Bay Rock) to operate the properties. At that time one well only had been completed on Butler B at a depth of 2,900 feet. It was not then producing. Haring-Bay Rock attempted to re-establish production from this well but those efforts failed for the most part and all production from the well and the lease terminated on May 28, 1966.
 
 
 4
 On December 5, 1966, Haring and Bay Rock informed United that production had ceased, that the gas reserve was depleted from the well and that there was no gas available for sale at that time. No deliveries of gas had been made to United since September 16, 1966. Following the notification that gas from the well was depleted, United wrote Bay Rock that it planned to remove its measuring station which had been used to measure gas delivered to it from the well on the Butler B lease but that if, at some future date, further gas should become available from the properties subject to the 1953 contract, United should be informed so that it could arrange to reinstall the measuring equipment. United then removed the measuring equipment. Haring testified that he then considered the 1953 contract terminated.
 
 
 5
 Haring thereafter assigned his working interest rights, as successor lessee, to certain sands or reservoirs between depths of 8,700 to 9,700 feet. By means of unitization, the McCombs Group (Group) acquired the right to drill into these deeper depths involving the Butler B lease and an adjoining tract known as the Butler A lease, consisting of some 150 acres. Thereafter, the Group drilled and completed four producing gas wells from the deeper depths. One other company, National Exploration Company (National) which had previously acquired the Haring working interests in the west 50 acres of the Butler B lease covering depths of 4,115 feet to 8,700 feet had completed two producing gas wells. United contacted National in April of 1972 relative to purchasing the gas from these two wells. National then first became aware, in examining title documents in anticipation of sale of the gas, of United's 1953 purchase contract. National informed United that the gas from its two wells may be subject to United's 1953 Gas Purchase Contract. It was then that United undertook a title search concerning the Butler B tract. In May, 1973, United learned of its interest under the 1953 contract.
 
 
 6
 Haring did not at any time inform the Group of United's 1953 Gas Purchase Contract. He considered that contract terminated when production ceased from the single producing well on May 26, 1966. When he transferred his working interest rights to the deeper horizons in the Butler B lease to the Group, Haring did not believe that United had any further right or claim to gas which may be thereafter produced from the lease. The Group, before drilling, relied upon a 1967 title opinion which did not reflect any interest which United might have in the Butler B tract. After the Group realized production from its first well drilled on the Butler A tract in 1971, it contacted United, together with other prospective gas purchasers, relative to negotiations for sale of the gas. United wrote the Group on November 19, 1971, inquiring with regard to how the Group had acquired its interests in the leases. There is nothing in the record which casts any light on the negotiations. However, the Group did obtain a new title opinion on December 7, 1971, which for the first time disclosed to the Group United's 1953 Purchase Contract relating to the Butler B lease. Thereafter, in February, 1972, the Group discovered commercial gas from another well drilled on the Butler A tract. A title opinion of May 31, 1972, did not disclose any interest of United therein. In June of 1972, the Group concluded successful negotiations whereby it agreed to sell all of the gas it purchased from the Butler A and B leases to E.I. duPont deNemours & Company for industrial uses in intrastate commerce.
 
 
 7
 The Group successfully completed two more gas wells on the unitized tracts. Thereafter, on June 6, 1973, United notified the Group that it claimed all of the gas being produced from these tracts under and by virtue of its 1953 Gas Purchase Contract. The Group thereupon initiated a declaratory judgment action in the district court of Karnes County, Texas, against United. The action was removed to federal district court. On October 9, 1973, United filed a complaint with the FPC. Our reported opinion in McCombs v. Federal Power Commission, supra, detailed those proceedings leading to the Commission's adoption of the administrative law judge's conclusion that "the service authorized and the gas supply dedicated [under the original certificate involved here] include any and all gas produced from the Butler B acreage "and that, consequently, the intrastate sale to duPont was violative of the Natural Gas Act. The administrative law judge further found that however negligent United may have been in asserting its rights under the 1953 Gas Purchase Contract and however innocent the Group may have been, that, notwithstanding, the Group should be ordered to cease and desist from continuing sales to duPont.
 
 
 8
 The basic matter for our determination of this rehearing relates to the issue of abandonment. The Commission held that there can be no abandonment of a certificate authorizing interstate service absent strict compliance with the requirements of petition, notice, hearing and establishment of cause for abandonment as required under 15 U.S.C.A. Sec. 717(b) and Sec. 717f(b).
 
 
 9
 Additional facts relating to the matter of abandonment set forth in our reported opinion in McCombs v. Federal Power Commission, supra, are appropriate here:
 
 
 10
 To consider again some of the facts outlined above as they relate to this issue, the one producing gas well on the Butler B lease ceased producing early in 1966. The lease was assigned by Pagenkopf effective in March 1966, and the assignee, Haring, attempted to work over the well. During this work, about 3,000 Mcf was produced, but all production again ended in May 1966. The operator for Haring advised the gas purchaser, United, in December 1966 that the well was depleted. United thereafter in 1966 removed the equipment it had connected to the well. Thus, the only producing gas well was abandoned in the fall of 1966. The operator and the purchaser recognized that there could be no more gas delivered from the well. This was a physical fact beyond the control of either of them, and they recognized the realities of the situation. The operator or owner had tried to restore production but was unable to do so. The sellers and buyers wished to continue the sale and purchase of gas but could not do so. The record does not show that any gas was ever produced thereafter from this original well. The witness Haring who was the owner who attempted the workover, and who was a petroleum geologist, testified:
 
 
 11
 "Certainly I was not aware of the gas reserves at deeper levels when the gas production ceased in 1966, and, as far as I know, neither United nor anyone else was aware of its existence."
 
 
 12
 In August 1968, the FPC wrote a letter to Pagenkopf suggesting that he file an application for abandonment. By an undated letter the Commission made a similar suggestion to the operator for Pagenkopf's successor, Haring. The FPC thus twice recognized that there had been no production for an extended time, and recognized that the abandonment should be formalized for its records. This must be acknowledged as a recognition by the Commission that there was in fact an abandonment, but there was something needed for the record. The records of the FPC as to this matter have apparently been destroyed under its procedures; consequently, it is not known what they may have indicated as to abandonment. The Commission in Opinion No. 740 in footnote 2 states as to the original proceedings for certification: "Our records indicate that Docket Nos. G-2997 and G-2998 were destroyed in 1964." It is apparent however from the testimony that no operator or owner filed a formal application to abandon.
 
 
 13
 542 F.2d at p. 1148.
 
 
 14
 In that same opinion we further observed and held:
 
 
 15
 Thus we have a situation where there was an abandonment as a recognition of the indisputable physical facts beyond anyone's control. The Commission participated in this recognition as there were at least two suggestions by the Commission that someone file something to tidy up the records. These letters from the Commission must be taken, in view of the destruction of the supporting records, to be an acknowledgment that there was an abandonment. It is difficult to see how a formal application, and a decision by the Commission could have added anything to these letters. In these circumstances, we must hold that there was an abandonment which was recognized by the Commission, and its jurisdiction ended.
 
 
 16
 Thus we must hold as a matter of law that there was an abandonment sufficient under Section 7(b) of the Natural Gas Act. This being a matter of law, we do not consider it within the expertise of the Commission.
 
 
 17
 The "abandonment" we refer to is that contemplated under Section 7(b) of the Act, as above indicated. This is the only "abandonment" which is applicable to these circumstances. Section 7(b) refers to "service rendered," and the ordering of further "service" would have been a futile gesture. The seeking of an application by the Commission was a recognition of the fact that no more gas could be delivered from the only gas well, and that the "service rendered" had long since ceased contrary to everyone's wishes. This action by the Commission thus could only have reference to Section 7(b).
 
 
 18
 542 F.2d at pp. 1148, 1149.
 
 
 19
 We know of no opinion dealing with a factual situation similar to that presented here. In light of the facts and circumstances contained and reflected in this record, we hold that the Commission erred in concluding that the cessation of gas production from the Butler B leasehold on May 28, 1966, did not constitute an abandonment under Section 7(b) of the Natural Gas Act.
 
 I.
 
 20
 FPC contends that Sec. 7(b) of the Natural Gas Act [15 U.S.C.A. Sec. 717f(b) ] is explicit in requiring that prior Commission approval must be obtained by any natural gas company before it can abandon any "facilities," or "service" involving the transportation and resale of gas dedicated by certificate to sale in interstate commerce. The full text of Sec. 7(b) is as follows:
 
 
 21
 No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that present or future public convenience or necessity permit such abandonment.
 
 
 22
 To be sure, just as we previously recognized in McCombs v. Federal Power Commission, supra, the decisions are abundant and clear on the point that in those cases where the supply of natural gas is not depleted, the service must be continued via the facilities authorized. Obviously, there could be no finding by the Commission that the available supply of natural gas has been depleted under such circumstances. United Gas Pipe Line v. Federal Power Commission, 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d 181 (1966); Sunray Mid-Continent Oil Co. v. Federal Power Commission, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960); Sun Oil Co. v. Federal Power Commission, 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639 (1960); Atlantic Refining Co. v. Public Service Commission of New York, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959); Phillips Petroleum Co. v. Federal Power Commission, 556 F.2d 466 (10th Cir.1977); Farmland Industries, Inc. v. Kansas-Nebraska Natural Gas Co., 486 F.2d 315 (8th Cir.1973); Valley Gas Co. v. Federal Power Commission, 159 U.S.App.D.C. 311, 487 F.2d 1182 (1973); J.M. Huber Corp. v. Federal Power Commission, 236 F.2d 550 (3rd Cir.1956); Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., 177 F.2d 942 (6th Cir.1949). These decisions support the proposition advanced by this court in Harper Oil Co. v. Federal Power Commission, 284 F.2d 137 (10th Cir.1960):
 
 
 23
 It would thus seem clear that once an independent producer of gas has dedicated his production to interstate commerce and thereby has come under the jurisdiction of the Commission, he remains thereunder so long as production continues. [Citing to Sun Oil Co. v. F.P.C., 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639.]
 
 
 24
 284 F.2d at p. 139.
 
 
 25
 We hold that, as a matter of law, based upon the facts and circumstances of the instant case, there was an abandonment under Section 7(b) of the Natural Gas Act which does not render the issue within the expertise of the Commission. Abandonment in the context of the facts and circumstances of this case cannot be equated with a voluntary "giving up" of valuable rights and/or property in the usual sense of relinquishment or surrender. Rather, the abandonment here presents the very practical recognition that there was no service to be rendered following the depletion of gas on December 5, 1966, from the Butler B leasehold. All parties recognized that for a period of five years thereafter no service could be rendered because the known gas reserves were depleted. These facts were acknowledged by all of the parties, including the Commission. Thus, the only known reserves of natural gas for which applications for certification had been made and authorized had been depleted. With its depletion and the subsequent five year period of non-service, there was no need for the formality of a Section 7(b) hearing. This is so because, in our view, all parties, including the Commission, considered that there were no gas reserves available following cessation of production and the subsequent efforts to restore production by workover methods in order to service the public consumer, and, of course, to profit from the discovery and sale.
 
 
 26
 At oral argument, the FPC contended that the certificate originally granted authorized and dedicated all gas without regard to depth or sand/reservoir limitations, to sale in interstate commerce and that there cannot be an "abandonment in fact." The FPC further argued that its expertise is required as a prerequisite to any abandonment in that a formal hearing may or might see the presentation of expert evidence by the Commission that further reserves of natural gas are likely to exist at other depths, zones, reservoirs, etc., underlying the subject leasehold. Nevertheless, counsel for the Commission did acknowledge that in factual instances such as those presented here, proof of depletion and efforts to resurrect production by workover attempts have been acceptable evidence of depletion of gas for purposes of abandonment orders under Section 7(b).
 
 
 27
 The Commission urges that Mitchell Energy Corp. v. Federal Power Commission, 533 F.2d 258 (5th Cir.1976) controls. That opinion held that although the 1949 contract between the gas producer and gas purchaser which dedicated all gas from the seller's interest in leaseholds and units in a particular field had expired in 1973, that nevertheless the successor in interest to the original producer was bound to dedicate the gas to interstate commerce because the successor assumed, as a matter of law, the original producer's obligations. That simply is not the case before us here. There had been no cessation of production in Mitchell and certainly no depletion of known reserves. Mitchell is not at variance with those decisions we have heretofore cited for the proposition that once natural gas is dedicated to interstate commerce it cannot be withdrawn from service in interstate movement without prior Section 7(b) FPC approval.
 
 
 28
 Our holding that strict compliance with the non-abandonment language of 15 U.S.C.A. Sec. 717f(b), supra, does not control under the facts and circumstances here is, we believe, buttressed by certain language contained in Union Oil Co. of California v. Federal Power Commission, 542 F.2d 1036 (9th Cir.1976). At issue there was the FPC requirement that all producers of natural gas dedicated to interstate commerce annually submit a Form 40 containing detailed information about their natural gas reserves. The Court rejected the FPC contention that the reporting burden on the producers was outweighed by the Commission's need to have the reservoir data. The Court stated, in pertinent part:
 
 
 29
 There is no evidence from which the FPC could conclude that the data required on Form 40 on a by reservoir basis were or could easily become available. The only evidence is to the contrary.. Although there was no evidence before the Commission to contradict the unanimous statements of the producers that natural gas reserve data are not kept by them on a 'by reservoir' basis and that such data would be extraordinarily expensive to obtain, the Commission majority found that '[T]here is little doubt that the information required ... is possessed by the respondents.' ... This assertion is simply wrong .... The Commission's factual determination that the data required are available is not supported by any evidence, much less by substantial evidence.
 
 
 30
 542 F.2d at p. 1042.
 
 
 31
 We conclude that the abandonment of the service in the instant case was accomplished, as a matter of law, when all of the parties recognized that the then known natural gas reserves were depleted in 1966 followed by failure to provide any service under the certificates for a period of five years during which time there was no evidence of other estimated gas reserves recoverable from the subject leaseholds.
 
 
 32
 We direct that all orders included in the Commission's Opinions Nos. 740, 740-A, and 740-B be set aside. We remand with directions that other pending proceedings in the Commission's Docket No. CP74-94 based on such orders be terminated and that the proceedings be dismissed.
 
 
 33
 IT IS SO ORDERED.
 
 HOLLOWAY, Circuit Judge, dissenting:
 
 34
 I respectfully dissent. While the equities favor the McCombs Group, duPont and National, usual contract rules and equitable considerations do not control in this proceeding under the Natural Gas Act, in my opinion. Instead, there are mandatory statutory requirements on abandonment of service which were imposed to protect the public interests recognized by the Act, Sunray Oil Co. v. FPC, 364 U.S. 137, 143, 80 S.Ct. 1392, 4 L.Ed.2d 1623, and these provisions convince me that we should affirm the basic holding of the Commission in this case.[1]
 
 
 35
 The majority opinion reasons (p. 1380) that: there was an abandonment in fact after all production ceased in 1966 on the Butler B lease from then known productive formations, as recognized by the Commission and the parties; that with this recognized abandonment the Commission's jurisdiction ended; and that this abandonment was sufficient, as a matter of law, under Sec. 7(b) of the Natural Gas Act, 15 U.S.C. Sec. 717f(b), and this being a matter of law, it was not within the expertise of the Commission.
 
 
 36
 To me these conclusions are directly contrary to the plain terms of Sec. 7(b). The statute could hardly be clearer in saying that:
 
 
 37
 No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment. (Emphasis added).
 
 
 38
 It is the Commission that must make the required findings and give approval before abandonment is legally effected, and not private parties by their agreement on the facts as to depletion and their consent to discontinuation of service. Nor does a determination by another tribunal that abandonment has occurred, as a matter of law, satisfy Sec. 7(b). As the Supreme Court pointed out in Sunray, supra, 364 U.S. at 158 n. 25, 80 S.Ct. at 1404:
 
 
 39
 It might be observed that in these cases the Commission issued certificates without time limitations. Thus if the companies, failing to find new sources of gas supply, desired to abandon service because of a depletion of supply, they would have to make proof thereof before the Commission, under Sec. 7(b). The Commission thus, even though there may be physical problems beyond its control, kept legal control over the continuation of service by the applicants. (Emphasis added).
 
 
 40
 See also Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378, 389, 79 S.Ct. 1246, 3 L.Ed.2d 1312; Phillips Petroleum Co. v. FPC, 556 F.2d 466, 469 (10th Cir.); Mitchell Energy Corp. v. FPC, 533 F.2d 258, 261 (5th Cir.).
 
 
 41
 The majority lays stress on the fact that production from the known reserves underlying the Butler B lease was depleted in 1966, that there was testimony that neither United, the producer, nor anyone else was then aware of deeper reserves, and that as a practical matter there was no service that could be rendered thereafter from that lease. And, as the majority says, counsel for the Commission conceded that proof of such depletion and of failure of efforts to re-establish production has been accepted by the Commission in Sec. 7(b) proceedings as a basis for permission for abandonment. Further the Commission did twice write suggesting that an application for abandonment be filed, which action the majority interprets as Commission recognition that there was in fact an abandonment.
 
 
 42
 However, there were other reserves as is now known, and United did state that while it would remove its metering equipment in 1966, it would reinstall such equipment whenever further gas might be delivered under the contract. (J.A. 137). In view of these circumstances it may not be quite certain what would have happened if application for a complete abandonment had been made, notice thereof had been given by publication,[2] and a final abandonment approval had been considered by the Commission. But, in any event, permission for abandonment of all service was for the Commission and we cannot make the findings and give the approval which Congress deemed it necessary for the Commission to make. Sunray, supra, 364 U.S. at 142, 80 S.Ct. 1392.
 
 
 43
 The Commission noted in its Opinion 740 that the original 1953 contract covered merchantable natural gas produced from all wells now or hereafter drilled during the 10-year term of that contract (later extended to 1981) on specified leaseholds including the Butler B tract, and further noted that there was no mention of any particular depths in that contract. (J.A. 160-61). Further, the McCombs Group now does not contest the fact of delivery of gas from the Butler B lease to United.[3] Such delivery constituted both a sale under the contract and commencement of a "service" obligation in interstate commerce under the Act. Phillips Petroleum Co. v. FPC, supra, 556 F.2d at 469. As this delivery was made under a contractual dedication without limits as to depths, there was a dedication to interstate commerce of the underlying reserves in question, and the effort to resell the same gas amounted to an attempted abandonment, which could not be done without first obtaining approval of the Commission under Sec. 7(b). Ibid.
 
 
 44
 For these reasons I would sustain the Commission's conclusion that the commencement of service completed dedication to United in interstate commerce and thereby invoked the protection of Sec. 7(b). (J.A. 163). And concluding that procedures made mandatory by the Act have not been complied with, I must dissent.
 
 
 
 [1]
 The majority opinion does not reach other issues raised such as the propriety of the ruling on dissolution of the units and of the order requiring repayment to United of quantities of gas sold to duPont in the intrastate transaction, and the failure to sustain the motion challenging jurisdiction as to duPont. Thus it is unnecessary for me to address these issues. I will consider only the holding of the majority on the central abandonment issue
 
 
 [2]
 The Commission's regulations required notice by publication and mailing to States affected by the application, see 18 CFR Sec. 157.9 (January 1, 1969), and permitted petitions for interventions by persons desiring to participate. See 18 CFR Sec. 157.10 (January 1, 1969). Pipeline purchasers have been permitted to intervene in such proceedings. See e.g., Transcontinental Gas Pipe Line Corp. v. FPC, 160 U.S.App.D.C. 1, 2-3, 488 F.2d 1325, 1326-27, cert. denied sub nom. Natural Gas Pipeline Co. v. Transcontinental Pipe Line Corp., 417 U.S. 921, 94 S.Ct. 2629, 41 L.Ed.2d 226
 
 
 [3]
 The McCombs Group says that the statement by United indicated that the record shows that gas was received by United from the Butler B lease should be read with some caution. The McCombs Group points to the absence of evidence in the original record that gas wa actually delivered from the Butler B lease to United, but recognizes that United later presented some evidence on the point in subsequent proceedings before the Commission. The McCombs Group states that since it is not seeking merely a remand, it has not raised the delivery of Butler B gas to United as an issue in this review proceeding, except as evidence of the Commission's partiality toward United. (Reply Brief of McCombs Group, 2)